IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| RUSSELL SCHMIDT,<br><br>Plaintiff,<br><br>vs.<br><br>OLD DOMINION FREIGHT LINE, INC.,<br><br>Defendant. | CV 16–159–M–DLC<br><br>ORDER |

Before the Court are Defendant's motions for summary judgment. (Docs. 13, 15.) For the reasons explained below, the Court grants the motions.

## BACKGROUND[1]

Plaintiff Russell Schmidt ("Schmidt") began working for Old Dominion Freight Line, Inc. ("ODFL") in 2007 as a dock supervisor in Spokane, Washington. Around September 2008, Schmidt was promoted to the Service Center Manager in Sidney, Montana, and transferred to the same position in Missoula, Montana in January 2015. As the Service Center Manager, Schmidt was responsible for supervising all employees at the Missoula Service Center, including ODFL drivers.

---

[1] The following facts are taken from Schmidt's Complaint (Doc. 6), the parties' Statement of Stipulated Facts (Doc. 10), and the parties' Statements of Undisputed and Disputed Fact (Docs. 17 and 27).

-1-

He also had control over the day-to-day operations of the Missoula Service Center and exercised broad discretion in carrying out his duties.

As Service Center Manager of the Missoula Service Center, Schmidt reported to the Regional Vice President of ODFL, Scott Goodrich. Mr. Goodrich was located in Salt Lake City, Utah, and visited the Missoula, Montana location very infrequently. Thus, because of the autonomy of ODFL managers and minimal oversight, it was extremely important that ODFL could trust its Service Center Managers to act in conformance with company policies.

At the Missoula Service Center, Schmidt supervised all eight employees at the branch location, and two employees in Kalispell. ODFL drivers are required to sign into the ODFL BLU system, which tracks a driver's hours and records driving time and routes. Employees logged into the BLU system using the employee's unique employee identification number whenever they began driving. If the BLU system was not working, drivers recorded their hours using a paper log.

ODFL drivers are also required to use an electronic handheld computer when making deliveries, which tracks routes and deliveries and serves as the electronic delivery receipt that the customer signs. If a driver is unable to use a handheld, the driver was directed to fill out paper delivery receipts.

Ken Welling ("Welling") was employed by ODFL as a city or local driver in Missoula, and was supervised by Schmidt. Welling was involved in a work

related accident in October 2015 and was placed on light-duty work by his physician. Schmidt was aware of Welling's restrictions—particularly that Welling could not drive for ODFL—and was required as the Service Center Manager to fill out the paperwork to place Welling on restricted duty in ODFL's system.

In late November of 2015, Schmidt received a doctor's note from Welling which Schmidt believed released Welling to full duty. Schmidt scanned the doctor's note into the ODFL system and emailed corporate so the release could be processed.

The same day Schmidt received the doctor's note, without approval from corporate, he dispatched Welling on a number of routes in Missoula. Because Schmidt knew that Welling was still on modified duty in ODFL's system, he believed that Welling could not log into the BLU or the handheld device under his own employee number. Consequently, Schmidt gave Welling paper delivery receipts to use for the day. Schmidt further instructed Welling to sign his supervisor's name on the receipts.[2]

---

[2] ODFL contends that Schmidt told Welling to "forge" his supervisor's signature on the receipts. (Doc. 17 at 6–7.) However, Schmidt alleges that while he told Welling to sign another supervisor's name, this directive was not done with the intent to fraudulently impact the rights of Welling's supervisor, and that Welling's supervisor was present when Schmidt gave the instruction. (Doc. 27 at 9–10.) Thus, while Schmidt admitted to dispatching Welling without clearance, he does not agree that he instructed Welling to "forge" his supervisor's signature.

Another employee reported this incident to ODFL management. On December 8, 2015, the Director of Regional Operations, the Regional Manager of Human Resources and Development, and Schmidt met to discuss the incident. After the meeting, Schmidt resigned from ODFL.[3] Schmidt was earning a salary of approximately $1,632.14 per week at the time his employment ended. Further, it is undisputed that Schmidt had completed Montana's statutory probationary period of employment by the date of his termination.

Schmidt filed suit in the Montana Fourth Judicial District Court, claiming: Count 1: Wrongful Discharge from Employment, and Count 2: Intentional Interference with Business Relations. ODFL removed to federal court, and now moves for summary judgment on both counts.

**LEGAL STANDARD**

Summary judgment is proper if the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of informing the Court of the basis for its motion and identifying those portions of

---

[3] Although Schmidt technically resigned from his employment, he did so after ODFL told him he would be terminated if he did not resign. As recognized by the Montana Supreme Court in *Jarvenpa v. Glacier Electric Cooperative*, 898 P.2d 690, 693 (Mont. 1995), when an employer tells an employee that he will be terminated if he does not resign, the resignation by the employee constitutes a constructive discharge. No party disputes that Schmidt's resignation is a constructive discharge and that it must be analyzed according to the WDEA.

"the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The movant's burden is satisfied when the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–252 (1986). Where the moving party has met its initial burden, the party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248 (internal quotation marks omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248. The elements of each claim determine which facts are material. *Id.* at 248. Only disputes over facts that might affect the outcome of the suit under the governing law properly preclude entry of summary judgment. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).

## ANALYSIS

### A. Tortious Interference Claim

ODFL contends that summary judgment is warranted on Count 2 because it is preempted by the Montana Wrongful Discharge from Employment Act ("MWDEA") and it also fails because Schmidt cannot establish all of the elements of tortious interference. If not preempted, ODFL argues that the undisputed facts establish that ODFL acted lawfully or with justifiable cause in providing information to Plaintiff's subsequent employer because it timely and completely disclosed all information required by the Federal Motor Carrier Safety Regulations. Schmidt concedes that the motion is well taken because the evidence currently before the parties demonstrates that ODFL presented the information required by the Federal Motor Carrier Safety Regulations within the time set forth in the regulations. (Doc. 30 at 1–2.) Consequently, ODFL's motion for summary judgment on Count 2 is granted.

### B. Wrongful Termination Claim

ODFL argues that summary judgment should be granted on Count I because it had good cause to terminate Schmidt's employment since Schmidt instructed a subordinate employee to engage in forgery and dishonesty. (Doc. 14 at 7.) Schmidt contends that good cause did not exist to terminate Schmidt's employment because other ODFL managers engaged in similar conduct. (Doc. 26 at 3.)

In order to establish a wrongful discharge claim, an employee has the burden of proving his or her discharge was wrongful. *Becker v. Rosebud Operating Servs., Inc.*, 191 P.3d 435, 441 (Mont. 2008). Under the Montana Wrongful Discharge from Employment Act ("WDEA"):

(1) A discharge is wrongful only if:

(a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;

(b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or

(c) the employer violated the express provisions of its own written personnel policy.

Mont. Code Ann. § 39–2–904 (2017). Under subsection (b), "good cause" is defined as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason." § 39–2–903(5). A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Becker*, 191 P.3d at 441 (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont. 1993)). The Montana Supreme Court has further explained that:

> An employer's legitimate right to exercise discretion over whom it will employ must be balanced, however, against the employee's equally legitimate right to secure employment. The balance should

> favor an employee who presents evidence, and not mere speculation
> or denial, upon which a jury could determine that the reasons given
> for his termination were false, arbitrary or capricious, and unrelated to
> the needs of the business.

*Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (citing *Kestell*, 858 P.2d at 8. In *Johnson*, a Costco shift worker was terminated for violating company policies that prohibited him from eating Costco food during work hours. The court found that Costco applied its employment policies arbitrarily to the plaintiffs because other shift workers had violated the policy repeatedly, and they admitted to doing so at trial. *Id*. at 734.

The Montana Supreme Court has also found that employers are afforded the "greatest discretion" when determining whether to terminate a managerial employee. *Sullivan v. Cont'l Constr. of Mont., LLC*, 299 P.3d 832, 835 (Mont. 2013). "A court should not become involved in the day-to-day employment decisions of a business regarding its management." *McConkey v. Flathead Elec. Co-op.*, 125 P.3d 1121, 1126 (Mon. 2005) (quoting *Buck v. Billings Montana Chevrolet, Inc.*, 811 P.2d 537, 541 (Mont. 1991)). Further, courts should afford employers great discretion when the employee occupies a "sensitive" managerial position exercising "broad discretion." *McConkey*, 125 P.3d at 1126.

Schmidt is not a probationary employee. Thus, he must establish that his termination was not for good cause. Schmidt argues that according to *Johnson*, if

other employees violate the same company policy, then "good cause" does not support termination for the same conduct. The Court does not agree that the facts of this case are similar to *Johnson*. In *Johnson*, the plaintiff was a shift-worker and not a manager, and complained of other shift-workers engaging in similar conduct. Here, Schmidt is a manager and is subjected to heightened standards and responsibilities. In fact, Schmidt agrees that managers are in sensitive positions and that because of his position, it was extremely important that ODFL could trust him. (Doc. 27 at 2–3.)

According to *Sullivan* and *McConkey*, a court must not interfere with the day-to-day operations of a business and should allow employers broad discretion in relation to the employment of managerial level employees. Consequently, the Court affords ODFL deference and finds that because it could no longer trust Schmidt as a manger it had a legitimate business reason to end Schmidt's employment. Schmidt admits that he told Welling to not log into the handheld device to record his driving trip, and admits that he told Welling to sign his supervisor's name on the delivery receipts instead of his own. (Doc. 27 at 9.) Even though Schmidt contends that "forgery" is a "pejorative" term and that he never told Welling to "forge" a signature, the conduct here is essentially the same: he instructed Welling to sign a name other than his own and not log into the BLU system. (Doc. 27 at 9.) Thus, because Schmidt's conduct was untrustworthy and

-9-

ODFL could no longer rely on Schmidt to effectively manage the day-to-day operations of the Missoula Service Center, ODFL had a legitimate business reason to discharge Schmidt.

However, the reasoning in *Johnson* and *Sullivan/McConkey* overlap in one respect: if another manager of the company was involved in similar conduct and was not terminated, then evidence exists that may lead a jury to believe that the employer arbitrarily applied its employment policies. Thus, if Schmidt is able to produce evidence that another managerial employee of ODFL engaged in similar conduct, then ODFL's reasoning to terminate Schmidt was a mere pretext and Schmidt's wrongful discharge claim may have legs.

Still, Schmidt's proffered evidence fails in this respect. Schmidt contends that there are several instances of other ODFL managers "engaging in similar, and in many cases, more egregious conduct, and despite engaging in this conduct, these managers were not terminated by ODFL." (Doc. 26 at 5.) Schmidt submits in support of this contention the testimony from Gary Reiter ("Reiter"), a manager of sales and service for ODFL's Richfield, Utah center, and from Larry Panzeri ("Panzeri"), a sales representative for ODFL. Schmidt offers his personal knowledge of other managers falsifying ODFL documentation.

Evidence from Panzeri and Schmidt is not admissible. Panzeri is not a manager and is not responsible for supervising any employees. (Doc. 28-3 at 2.)

-10-

Panzeri testified that he has no knowledge of a "push" at ODFL to falsify documents. (*Id.* at 3.) Further, he testifies that he could not offer any opinions related to ODFL management policies at the time of Schmidt's discharge. (Docs. 28-3 at 4; 33-4 at 19–20, 24.) Consequently, although Panzeri's job title was a "Service Center Manager," he was not in the same managerial position as Schmidt and lacks foundation to testify to anything regarding ODFL management practices and policies. Therefore, Panzeri's testimony is inadmissible.

Further, Schmidt's testimony regarding his own beliefs about ODFL management practices is inadmissible. Schmidt may have knowledge of other managers allegedly manipulating driver logs to increase productivity numbers, but such testimony is hearsay and is precluded pursuant to Federal Rules of Evidence 801(c) and 802.

Thus, the only potentially admissible evidence to support Schmidt's wrongful discharge claim is testimony from Reiter. ODFL argues that Reiter's deposition testimony and affidavit contradict each other, which renders his affidavit inadmissible as a sham affidavit. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (citations omitted). "This sham affidavit rule prevents a party who has been examined at length on deposition from rais[ing] an issue of fact simply by

submitting an affidavit contradicting his own prior testimony, which would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id*. at 1080. However, the sham affidavit rule "should be applied with caution because it is in tension with the principle that the court is not to make credibility determinations when granting or denying summary judgment." *Id*. (internal quotations omitted). Thus, "in order to trigger the sham affidavit rule, the district court must make a factual determination that the contradiction is a sham, and the inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit." *Id*. (internal quotations omitted).

In his deposition, Reiter testified that he had no knowledge of other service center managers engaging in conduct similar to Schmidt's conduct. His sworn testimony on this subject is as follows:

> Q. One of the things that you've been identified to testify about is that employees, other than Mr. Schmidt, engaged in similar conduct to him and weren't disciplined or weren't terminated or encouraged to resign. Is that something that you plan on testifying about?
>
> A. I would not be able to. I honestly don't know. I mean, you asked the question a little while ago, you know, if I was privy to information about why a manager was terminated or this or that. I can say that the entire time I was there for, you know, a little over nine years there was probably five managers that were terminated and there was never even an utterance of what the reason for termination was.

(Docs. 28-2 at 3; 33-3 at 12.) Reiter is also not aware of another service center manager at ODFL instructing a subordinate employee to complete deliveries without being logged into the BLU system. (Doc. 28-2 at 4.) On the other hand, Reiter's affidavit submitted by Schmidt in response to ODFL's motion for summary judgment presents different testimony regarding ODFL management practices. (Doc. 29.) Reiter testifies to other conduct within ODFL such as dummying up records (*Id*. at 2), and accounting for shipments using another employee's credentials in the computer system (*Id*. at 3). The Court understands ODFL's argument that this affidavit contradicts Reiter's prior deposition testimony. Reading the deposition in a broad context, Reiter's affidavit may be considered a sham because he did not disclose this other conduct at his deposition. However, he was only asked at his deposition whether he had any knowledge of "similar conduct" directly related to other managers engaging in conduct similar to Schmidt's conduct, to which Reiter testified that he did not. The Court finds that according to *Yeager*, there is no clear and unambiguous inconsistency to justify striking the affidavit. Interpreting the deposition in the light most favorable Schmidt, it is very possible Reiter only meant to answer the question regarding similar conduct in reference to Schmidt's specific conduct. Thus, Reiter's additional testimony in his affidavit is referencing "other conduct" and not "similar

conduct." Moreover, it is within the province of the jury to determine Schmidt's credibility. Thus, the affidavit is admissible.

Nonetheless, Reiter's affidavit does not offer any evidence regarding similar conduct. None of the conduct referenced by Reiter is as serious or problematic as instructing a subordinate employee to violate ODFL policy by not logging into ODFL's systems, forging a signature on a delivery receipt, thereby creating legal liability for ODFL. Unlike in *Johnson* where a shift worker was terminated for eating food on the job when other shift workers often did the same thing, here Reiter only explains other conduct of ODFL managers that is not parallel to Schmidt's conduct. Reiter testifies that other managers sometimes marked untimely shipments as timely in the ODFL system in order to generate superior numbers, that he personally entered the weight the shipper declared when it was not actually reweighed in order to comply with ODFL standards, that he assigned his deliveries to another employee in the ODFL system because there was no way to account for his pick-ups, and that a large customer of ODFL, Barnes Bullets, was not required to correctly fill out hazmat bills of lading because the customer was a good friend of ODFL bosses. (Doc. 29 at 2–5.)

While this other conduct may show that ODFL had sub-par business practices, they are not "similar" to Schmidt's conduct. Even though Schmidt knew that Welling was not medically cleared by ODFL to drive shipments, he

nevertheless sent Welling out on deliveries. He did so by instructing him to not sign into the BLU system, and to forge his supervisor's signature on the paper receipts. ODFL explains that this created a legal liability for the company because Welling was not authorized to drive. This is an extremely serious matter. Therefore, there is a distinct difference in the "other conduct" referenced by Reiter and the serious, illegal conduct of Schmidt. Consequently, Schmidt cannot establish "similar conduct" of other ODFL managers sufficient to prove that ODFL's legitimate business reason to terminate Schmidt was pretextual. Thus, summary judgment in favor of ODFL on Count 1 is warranted.

Accordingly, IT IS ORDERED that:

(1) Defendant's motion for summary judgment regarding Count 1: Wrongful Discharge from Employment (Doc. 13) is GRANTED.

(2) Defendant's motion for summary judgment regarding Count 2: Intentional Interference with Business Relations (Doc. 15) is GRANTED.

(2) The Jury Trial set for April 9, 2018, is VACATED. All other pretrial dates are VACATED.

(5) The Clerk of Court is directed to enter judgment in favor of Defendant.

(6) This case is CLOSED.

Dated this 21st day of March, 2018.

*/s/ Dana L. Christensen*
Dana L. Christensen, Chief District Judge
United States District Court